# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MARCUS RAY TYRONE DRUERY, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-09-835 |
| | § | |
| RICK THALER, *Director*, | § | |
| *Texas Department of Criminal Justice-* | § | |
| *Correctional Institutions Division*, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM, OPINION & ORDER

This case is before the Court on petitioner Marcus Ray Tyrone Druery's petition for writ of habeas corpus, and respondent Rick Thaler's motion for summary judgment. Having carefully considered the petition, the summary judgment motion, the evidence, and the arguments and authorities submitted by counsel, the Court is of the opinion that respondent's motion for summary judgment should be GRANTED, and Druery's petition for writ of habeas corpus should be DENIED.

## I.   Background

Petitioner Marcus Ray Tyrone Druery, currently in the custody of the Texas Department of Criminal Justice, filed this federal habeas corpus application pursuant to 28 U.S.C. § 2254. Because this is Druery's first application for federal habeas relief, a brief history of the case is appropriate.[1]

On October 30, 2002, Druery went to Skyyler Browne's apartment on the Texas State Technical College campus in Waco where both were students. Druery asked Browne to travel with him to Bryan, Texas. Browne hesitated but eventually agreed to go. Browne took his cell phone,

---

[1] For the sake of convenience, the key facts surrounding the case are adopted largely from the opinion of the Texas Court of Criminal Appeals ("TCCA") affirming Druery's conviction and sentence. *See Druery v. State*, 225 S.W.3d 491 (Tex.Crim.App.), *cert. denied*, 522 U.S. 1028 (2007). Divergence from, or expansion upon, the TCCA's recitation of the facts will be noted by a specific citation to the record.

$400 to $500 in cash, his gun, and some marijuana. No one at the school ever saw him again. Druery later told a Texas Ranger that, after he and Browne traveled from Waco to Bryan, they partied into the night, but Browne wanted to go home.  Druery recounted to the Ranger that Browne called a girlfriend, and the girlfriend picked him up from the Contiki Club in an orange Cadillac. Law enforcement officers never located the orange Cadillac.

Joquisha Pitts and Marcus Harris told a different story. Pitts was Druery's former girlfriend, and Harris was Druery's high school age friend. Pitts recounted at trial that she had known Browne for only a couple of days when she witnessed his murder. She accompanied Druery and Browne to the Contiki Club.  On the way, the group picked up Harris, as well as some ecstasy tablets and some embalming fluid, which is put on cigarettes and smoked to produce a high. Harris recounted at trial that this was his first meeting with Browne. Between approximately 1:00 and 1:30 a.m., Druery, Browne, Pitts, and Harris left the Contiki Club at Druery's suggestion to go to rural property owned by the Druery family. Pitts drove Druery's car as Druery navigated.

During the drive to the country, Druery claimed that someone was following them, and he repeatedly asked Browne for his gun. Browne refused. Once at the property, Druery unlocked the gate and drove the group to a stock pond. Using the vehicle's headlights for illumination, each member of the group took turns shooting Browne's gun at bottles they threw into the water. At this time, Druery called Pitts to the car and told her he was going to kill Browne, saying he wanted Browne's "stuff." Pitts reminded Druery that Druery had a two-year-old son, and she ultimately believed that Druery was "just playing."

After he shot the gun, Druery claimed that the ammunition ran out, and he returned to the car. Pitts saw Druery take bullets from the car's console, wipe them clean with a rag, and place them in

the pistol's magazine. Druery then called Harris to the vehicle, telling him that he planned to shoot Browne, but Harris believed that Druery was "tripping" on embalming fluid.  Druery then ordered both Pitts and Harris to sit in the car.

Standing near the pond, Browne pulled his jacket or a hood over his head to block the wind as he attempted to light a pipe or cigar filled with marijuana. Druery skulked toward Browne under the cover of darkness, held the gun within six inches of his head, and fired. As Browne's body fell, Druery fired a second shot into Browne's neck, and then he fired a third shot into Browne's body as it lay on the ground.  Pitts and Harris began to cry and scream, and both saw Druery kneel over Browne's body.  Druery returned to the vehicle with Browne's cell phone, money, marijuana, and gun. He attempted to calm his hysterical companions by giving them each 40 dollars.

Druery got some gasoline and poured it on Browne's body.  He set it on fire, and the three left as the body burned.  During the drive, Druery instructed Pitts and Harris about how to respond to questions about Browne.  He told them to say that Browne's girlfriend picked him up in an orange Cadillac to take him to get his sister in Washington D.C. and that they didn't see him again.  The next day, Druery returned to the pond with Pitts and two others, burned the body a second time, and threw it into the pond.  Later, Harris helped Druery dispose of the murder weapon.

Pitts eventually went to the police and told them that she was scared and wanted to get it off her chest. Harris told authorities that he thought he would die because he believed Druery would not want to leave any witnesses to the killing.  *Druery v. State,* 225 S.W.3d 491, 496 -497 (Tex.Crim.App.), *cert. denied*, 522 U.S. 1028 (2007).

Druery's ex-girlfriend, Chasiti Hall, testified that Druery told her that he shot and killed someone.  He also showed Hall a 9 millimeter gun and told her that he was going to get rid of the

gun.  16 Tr. at 66-67.[2]  Angela Minor, a friend of Druery's, also testified that Druery told her that

he killed someone.  *Id.* at 95.  The jury found Druery guilty of capital murder for murdering Browne

during the course of robbing or attempting to rob him.  22 Tr. at 106; 16 Tr. at 20-21.

During the penalty phase, the State presented evidence of numerous violent incidents

involving Druery.  Hall testified that she dated Druery but broke up with him because he became

violent toward her.  23 Tr. at 5-25 Tr. at 20.  The State also presented evidence of unadjudicated

offenses for drug possession.  *Id.* at 106-68.

Druery's grandmother, Mary Druery, testified on his behalf.  She testified that Druery was

a kind young man.  He belonged to the 4H Club and was active in his church.  After college,

Druery's behavior changed and his grandmother suspected that he was using drugs.  She testified that

he changed for the better during the year he was in pretrial detention and did not have access to

drugs, and opined that he would be able to return to society if paroled after serving 40 years of a life

sentence.  *Id.* at 23-.33.  Sheila Richardson testified that Druery was in 4H with her children.  She

testified that he was quiet and polite and came from a good home.  *Id at 37*-43.  Druery's aunt,

parents, cousin, and family friends gave substantially similar testimony. *Id.* at 51-74; 81-26 Tr. at

10.  Other witnesses testified about rehabilitation programs available to Texas inmates and opined

that Druery could be rehabilitated.  *Id.* at 12-27.

The jury unanimously found beyond a reasonable doubt that there is a probability that Druery

would commit criminal acts of violence that would constitute a continuing threat to society, and that

the mitigating evidence was insufficient to merit a life sentence.  27 Tr. at 5.  Accordingly, the trial

court sentenced Druery to death.  *Id.* at 7-8.

---

[2]        "Tr." refers to the transcript of Druery's trial.

The TCCA affirmed Druery's conviction and sentence, *Druery v. State*, 225 S.W.3d 491 (Tex.Crim.App.), *cert. denied*, 522 U.S. 1028 (2007), and denied his application for a writ of habeas corpus, *Ex Parte Druery*, No. 68,877-01 and 68-877-02 (Tex.Crim.App. Mar. 19, 2008).  Druery filed this federal petition for a writ of habeas corpus on March 17, 2009.

II.    Discussion

A.    The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210

F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual

determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522

U.S. 1119 (1998).

      B.     The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary

judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202

F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  In ordinary civil cases, a district court

considering a motion for summary judgment is required to construe the facts in the case in the light

most favorable to the non-moving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)

(The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in

his favor"). However, where a state prisoner's factual allegations have been adversely resolved by

express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and

convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1)

should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor.

*See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981);

*Foster v. Johnson*, 293 F.3d 766, 777 (5th Cir.), *cert. denied sub nom Foster v. Epps*, 537 U.S. 1054

(2002); *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001);

*Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997),

*cert. denied*, 525 U.S. 969 (1998).  Consequently, where facts have been determined by the Texas

state courts, this Court is bound by such findings unless Druery shows that an exception to 28 U.S.C.

§ 2254 applies.

C.    Summary Judgment in the Instant Case

Druery asserts, in six separate claims, that trial counsel rendered ineffective assistance and that the trial court erred in its jury instructions at both phases of the trial.

1.    Ineffective Assistance Of Counsel

In his first three claims for relief, Druery contends that his trial counsel rendered ineffective assistance.  To prevail on a claim for ineffective assistance of counsel, a petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88.   Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances. *Id.* at 688.  Review of counsel's performance is deferential.  *Id.* at 689.

a.    Lesser Included Offense

In his first claim for relief, Druery argues that trial counsel rendered ineffective assistance by failing to obtain a lesser included offense instruction to the jury on the charge of murder.  Druery points to a section of the trial transcript in which the trial court specifically asked both sides if they wanted the lesser included offense instruction, and both specifically declined.  *See* 21 Tr. at 3-5.

During closing argument, defense counsel Craig Washington told the jury that the evidence was insufficient to prove the underlying offense of robbery, and stated that "another jury on another day may decide whether he's guilty of murder."  22 Tr. at 78-79.  The State objected on the grounds that a subsequent prosecution for murder would violate the double jeopardy clause, and the trial court

8

sustained the objection.  *Id.* at 79.  Following closing argument, Washington continued to insist that a subsequent prosecution for murder was not double jeopardy.  *Id.* at 103-05.  Washington was wrong.

When a lesser offense requires no further proof than that required for conviction on a greater offense, then double jeopardy bars a subsequent prosecution for the lesser offense after acquittal of the greater.  *See*, *e.g.*, *Brown v. Ohio*, 432 U.S. 161, 168 (1977); *Blockburger v. United States*, 284 U.S. 299 (1932).  Druery argues that Washington based his strategy on his misunderstanding of the law of double jeopardy, declining the trial court's offer of a lesser included offense instruction in the belief that he could argue to the jury that Druery could be tried again on a murder charge if acquitted of capital murder.

The state habeas court conducted an evidentiary hearing.  Based on the testimony, the trial record, and Washington's affidavit, the state habeas court found that Washington made a deliberate strategic choice not to seek a lesser included offense instruction.  1 SH at 671-72.[3]  The court noted that Druery and his family rejected a previous plea offer carrying a life sentence and elected to go to trial.  *Id.* at 687.  Washington concluded that, while the State proved murder, it did not prove the underlying offense of robbery necessary to elevate the murder to capital murder.  He specifically cited to the jury the relative lack of evidence supporting robbery, and specific evidence undercutting a finding that he intended to rob Browne.  Specifically, Washington noted that Druery did not take a necklace from Browne, needed cash from Joquisha Pitts to buy a TV shortly after the murder, and put additional minutes on his cell phone the following day, despite allegedly stealing Browne's cell phone.  He therefore believed that the jury would have to acquit Druery of capital murder and, without the option of a lesser included offense, there would be no remaining charge on which to

---

[3]     "SH" refers to the transcript of Druery's state habeas corpus proceeding.

convict Druery.  *Id.* at 671-74.  The habeas court cited the controlling law, found that the trial record supported Washington's rationale and that it was reasonable trial strategy, *id.* at 672-78, 697-98, and concluded that Washington's performance was not deficient.  The record supports this conclusion.

As the *Strickland* court observed, review of counsel's performance must be deferential, viewed, as much as possible, without the distorting effects of hindsight.  *See Strickland*, 466 U.S. at 689.  While Druery points to evidence suggesting that counsel was mistaken about the law of double jeopardy, the record also supports a finding that counsel acted reasonably in an effort to win a complete acquittal, rather than settling for a murder conviction and a life sentence.  In light of Druery's previous actions indicating that he did not want to accept a life sentence, counsel's all-or-nothing approach was within the range of acceptable trial strategy.

Druery emphasizes Washington's misunderstanding of the law of double jeopardy and argues that his decision could not have been reasonable because he misunderstood the relevant law.  While Washington's misunderstanding of the law is disturbing, he nonetheless articulated valid and independent strategic reasons for his decision.  The state habeas court found his explanations credible, and his strategy is supported by the trial record.  Because the state habeas court's conclusion that counsel did not render deficient performance was reasonable, based on the record, it is entitled to deference under the AEDPA.  Therefore, Druery is not entitled to relief on this claim.

      b.      <u>Failure To Investigate</u>

In his second claim for relief, Druery argues that Washington failed to investigate, prepare, and present mitigating evidence.  Druery claims that Washington did not begin to prepare his mitigation case until after the jury convicted Druery of capital murder, never hired a mitigation specialist or psychological expert, and that investigation would have uncovered evidence of possible

brain damage from head injuries, accidents, exposure to toxic chemicals, and drug abuse, specifically, though not exclusively, PCP abuse.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S.510, 521 (2003) (internal quotation marks and alteration omitted) (quoting *Strickland*, 668 U.S. at 690-91). When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial. *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

The state habeas court rejected Druery's assertion that Washington did not prepare his mitigation case ahead of time. The court credited Washington's assertion that Druery's family hired an investigator who worked under Washington's direction and helped Washington prepare for both phases of the trial. SH at 645. The court also found that Washington presented a coherent penalty phase theory – that Druery's violent behavior was an aberration caused by drug abuse and that he would not be violent in prison, where he would not have access to drugs. *Id.* at 645-56. Numerous witnesses testified in support of this theory.

The state habeas court also found that Washington sought advice from a clinical psychologist before trial. He claims that he advised the Druery family to hire a mental health professional to examine Druery, but that the family declined to do so. The family disputed this assertion. Druery's parents admitted that they had no concerns about Druery's mental health until after he began using drugs, and Druery's mother testified that drug abuse was responsible for the changes in Druery's

behavior.  Two months before the murder, Druery indicated on a college application that he had

never suffered a head injury, and his parents never produced any evidence to the contrary.  *Id.* at 657-

59.

The court rejected as conclusory an affidavit submitted by a licensed social worker.  The

court also declined to credit an expert affidavit and testimony by Dr. Terry Rustin, a doctor

specializing in drug addiction, because he conceded that he did not know what, if any, drugs Druery

had in his system at the time of the murder, and he was not qualified to determine whether Druery

suffered from drug-related brain damage.  Dr. Rustin also testified that greed was not a characteristic

of PCP intoxication, yet the evidence showed that Druery took Browne's property immediately after

the murder.  He also noted that when a person on PCP becomes violent, he stays violent for several

minutes.  This is inconsistent with the evidence that Druery was calm immediately after the shooting.

*Id.* at 660-63.

The state habeas court rejected Druery's claim based on its findings that Washington was

prepared for the penalty phase, and that Druery presented no credible evidence of an actual brain

injury, disease, or any mental or physical defect.  *Id.* at 694.  The court also found that evidence of

brain damage would have been double-edged, and undercut the defense theory that Druery would

not be a threat if not on drugs.  *Id.* at 694-96.

The record supports the state habeas court's conclusions.  Druery points to evidence that

Washington did not interview any of the witnesses he actually presented at the penalty phase until

after the guilty verdict, and to the testimony and affidavits of the social worker and Dr. Rustin.  The

state habeas court found, however, that Washington did prepare and investigate before and during

the guilt phase in anticipation for the penalty phase.  This preparation and investigation included the

use of an investigator and consultation with a clinical psychologist.  The additional evidence Druery

claims Washington could have uncovered is speculative.   He cites no evidence, for example, that

he ever suffered a head injury.  The social worker's affidavit and Dr. Rustin's testimony and affidavit

were similarly speculative and, in the case of Dr. Rustin's conclusions, partially contradicted by the

trial evidence.  The record also supports the habeas court's conclusion that Washington made an

informed strategic choice to argue that Druery's violent behavior resulted from drug abuse, which

would not be a factor in prison.  The fact that this strategy ultimately failed does not mean that it was

an unreasonable choice at the time.  Because the state habeas court's conclusions are supported by

the record, they are not unreasonable, and are entitled to deference under the AEDPA.  Druery is not

entitled to relief on this claim.

c.      <u>Failure To Recommend Accepting Plea Offer</u>

In his third claim for relief, Druery contends that Washington rendered ineffective assistance

by failing to properly assess the strength of the State's case and failing to recommend that Druery

accept a plea offer carrying a life sentence.  Early in the proceedings, Druery was represented by

attorney Jim James.  The State offered a life sentence in exchange for a guilty plea to capital murder.

James recommended that Druery accept the offer, but Druery's family began looking for a new

attorney to represent him instead, finally retaining Washington.  Washington told the family that this

should not be a capital murder case, and that he could beat the charge.

The state habeas court found that, when James advised Druery of the plea offer, Druery was

not happy about the offer and did not want to accept it.  While in pre-trial detention, Druery wrote

several letters vowing to decline the offer.  In one, he asserted that he would rather  kill himself than

accept a life sentence.  SH at 635-38.  Druery now claims that he wrote these letters to impress the

female recipients, and points to an affidavit he submitted in support of his state habeas petition

13

claiming that he would have accepted the offer at a later date. The state habeas court found this post-sentencing assertion self-serving and not credible. *Id.* at 638-39.

The unhappiness with which Druery's family received James's advice that Druery accept the plea offer is evident from their immediate efforts to find a new lawyer. Washington understood from the outset that the Druerys were looking for an attorney to try the case, and not merely seeking a second opinion on the plea offer. *Id.* at 637. While Druery correctly points out that Washington's duty was to Druery, not Druery's family, Washington's impression that Druery was not seeking a plea bargain is borne out by Druery's letters from jail. The state habeas court also found that Druery consistently rejected the offer, even after Washington began his representation. *Id.* at 638-39. The state habeas court thus concluded that Druery did not establish either that Washington rendered deficient performance, or that Druery suffered any prejudice. *Id.* at 688-89. Druery's claim that he would have accepted the plea offer is contradicted by his own conduct before and during trial, and is supported only by his self-serving, after-the-fact, statement. In light of this record, the trial court's conclusion that Druery rejected the plea and would not have accepted a life sentence is reasonable and entitled to deference. Therefore, Druery fails to demonstrate that Washington rendered deficient performance.

## 2. The "12-10" Rule

Petitioner argues that Texas Code of Criminal Procedure article 37.071, which requires a jury instruction informing the jury that it must have at least 10 "no" votes to answer "no" on the aggravating special issue,[4] and at least 10 "yes" votes to answer "yes" on the mitigation special

---

[4]     "[W]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071 § 2 (b)(1).

issue[5] violates the Sixth, Eighth and Fourteenth Amendments by misleading the individual jurors into thinking that they cannot return a life sentence unless at least ten jurors agree on an answer to the mitigation special issue.   In fact, the failure to unanimously agree on a "yes" answer to the aggravating special issues or on a "no" answer to the mitigation special issue would result in a life sentence.  This, Druery argues, denies the jury an effective vehicle to express their reasoned moral response to the mitigating evidence.

Druery relies heavily on *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  In *Caldwell*, the prosecutor attempted to diminish the jurors' sense of personal responsibility for a death sentence by advising them that the state Supreme Court would review the sentence.  *Id.* at 323.  The U.S. Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the  . . . sentence lies elsewhere."  *Id.* at 328-29.  This is not Druery's argument, however.  He does not contend that the 12-10 rule diminishes jurors' sense of responsibility, but rather that it prevents individual jurors from giving effect to mitigating evidence.

The Fifth Circuit has repeatedly rejected this claim.  "We have concluded that '[u]nder the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.'" *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000) (quoting *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)).

---

[5]        "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." TEX. CODE CRIM. PROC. art. 37.071 § 2(e)(1).

While the trial court in this case informed the jury that it could not affirmatively find that the evidence was sufficient to warrant a life sentence unless at least 10 jurors agreed, it never instructed the jury that any particular number of jurors had to agree that any particular piece of evidence was mitigating. In other words, even if only one juror felt that a specific piece of mitigating evidence was mitigating, that juror could give the evidence any weight he deemed appropriate. The instruction stated only that at least 10 jurors, individually weighing mitigating evidence, had to agree that there was sufficient mitigating evidence to impose a life sentence. Petitioner is not entitled to relief on this claim.

### 3.   Lesser Included Offense Instruction

In his fifth claim for relief, Druery argues that he was denied due process when the trial court failed to give a *sua sponte* instruction on the lesser included offense of murder. Druery relies on *Beck v. Alabama*, 447 U.S. 625 (1980) for the proposition that due process requires a jury charge "on a lesser included offense if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater," *i.e.*, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense - - but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ." *Id.* at 635-37.

There are critical differences between *Beck* and Druery's case. In *Beck* the defendant was convicted and sentenced under an Alabama law that *prohibited* the trial court from giving a lesser included offense instruction, leaving the jury with the choice of convicting on the capital charge (and imposing a mandatory death sentence, reviewable by the trial judge), or acquitting the defendant entirely. *Id.* at 628-29. In this case, not only was the trial court not prohibited from giving such an instruction, the court specifically asked counsel if he wanted such an instruction. As discussed above, counsel made a strategic choice to decline the offer. The trial court did not err.

Even if the trial court did err by not giving the instruction over counsel's refusal, "[w]hen a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error." *Fields v. Bagley*, 275 F.3d 478, 486 (6th Cir. 2001); *see also United States v. Raymer*, 876 F.2d 383, 388 (5th Cir.), *cert. denied*, 493 U.S. 870 (1989)("a defendant cannot complain on appeal of alleged errors invited or induced by himself . . . ."). Druery is not entitled to relief on this claim.

4.   <u>Burden of Proof on Mitigation</u>

In his sixth claim for relief, Druery contends that he was denied due process when the trial court failed to instruct the jury that the State bore the burden of proof to negate Druery's mitigation evidence. Druery relies on, among other cases, *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Ring*, the Court extended the *Apprendi* holding to capital sentencing proceedings.

*Apprendi* itself, however, rejects Druery's effort to characterize mitigating evidence as equivalent to aggravating evidence, *i.e.*, evidence that "increases the penalty for a crime beyond the prescribed statutory maximum . . . ."

> Finally, the principal dissent ignores the distinction the Court has often recognized, *see*, *e.g.*, *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), between facts in aggravation of punishment and facts in mitigation. . . . If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

*Apprendi*, 530 U.S. at 491 n.16.  The Supreme Court has thus drawn a critical distinction between aggravating and mitigating circumstances in sentencing proceedings.  To the extent that some aggravating circumstance is required before the court may exceed an otherwise-prescribed sentencing range, the State must prove those aggravating circumstances beyond a reasonable doubt.  Under the Texas capital sentencing statute, the statutory maximum sentence in the absence of proof of aggravating circumstances is life imprisonment.  A court cannot sentence a defendant to death unless the State proves beyond a reasonable doubt that there is a probability that the defendant will commit future acts of violence constituting a continuing threat to society.  Once the State has proven this, the defendant may be sentenced to death. The sentencing scheme, however, gives a defendant another opportunity to show that death should not be imposed, even though the State has met its burden of proof.  The mitigation special issue is, in this sense, analogous to an affirmative defense. *Apprendi* does not prohibit placing the burden of proof on this special issue on the defendant.  The mitigation special issue does not address a factor necessary to increase the maximum sentence; rather, it addresses factors that allow the jury to impose a sentence *less than* the statutory maximum. "[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."  *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 546 U.S. 848 (2005).  Petitioner is not entitled to relief on this claim.

### III.   Evidentiary Hearing

This Court has discretion whether to conduct an evidentiary hearing. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded hearings in federal habeas corpus"); *Robison v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999).  An evidentiary hearing is not required if there are "no relevant factual disputes that would require development in order to assess the claims." *Id.*  "If it appears that an evidentiary hearing is

not required, the judge shall make such disposition of the petition as justice shall require."  Rule 8 of the Rules Governing Section 2254 Cases.

Druery has requested an evidentiary hearing, but has not demonstrated any factual dispute that would entitle him to relief.  *See Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996).  Each of Druery's claims can be resolved by reference to the state court record, the submissions of the parties, and relevant legal authority.  Accordingly, there is no basis upon which to hold an evidentiary hearing on these claims.

## IV.  Certificate of Appealability

Druery has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application

involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Druery's claims.  While the issues Druery raises are clearly important, the Court finds that each of the claims is foreclosed by clear, binding precedent.   Therefore, Druery has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This Court concludes that Druery is not entitled to a certificate of appealability.

V.   Order

For the foregoing reasons, it is ORDERED as follows:

1.      Respondent Rick Thaler's motion for summary judgment (Dkt. 6) is GRANTED;

2.      Petitioner Marcus Ray Tyrone Druery's petition for writ of habeas corpus (Dkt. 1) is in all respects DENIED, and Druery's petition is DISMISSED WITH PREJUDICE; and

3.      No Certificate of Appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas on July 26, 2010.

_____

Gray H. Miller

United States District Judge